IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-00198-MSK-MEH

SUN RIVER ENERGY, INC.,

    Plaintiff,

v.

ERIK S. NELSON,
STEVE STEPHENS, and
CORAL CAPITAL PARTNERS, INC.,

    Defendants.

## ORDER ON MOTION TO ENFORCE

Before the Court is Plaintiff's Motion to Enforce Settlement Agreement and for Sanctions [filed July 1, 2011; docket #91]. The matter has been referred to this Court for disposition [docket #92]. The motion is fully briefed and the Court held an evidentiary hearing on the motion on August 22, 2011. Thereafter, the Court permitted post-hearing briefs to be filed by the parties on or before August 31, 2011. Considering the entire record herein and for the reasons that follow, the motion is **denied**.

## BACKGROUND

Plaintiff initiated this lawsuit in Denver County District Court on January 10, 2011. (Docket #1-1 at 2-9.) Defendants removed the case to this District on January 26, 2011, pursuant to diversity jurisdiction. (*See* docket #1.) The dispute arises from a contract-based business relationship in which Defendant Coral Capital accepted 150,000 shares of restricted common stock of Plaintiff as payment, in lieu of cash, for certain services rendered. (Docket #35 at 2-3.) Plaintiff and Defendant Coral Capital entered into the contract on October 15, 2007; Plaintiff terminated the contract on

April 24, 2008, effective April 30, 2008. (*Id*. at 2.) The 150,000 shares were issued on or about August 7, 2008, to Defendants Erik Nelson, the president of Coral Capital, and Steve Stephens, an employee of Coral Capital, in equal parts. (*Id*. at 2, 3.) Plaintiff alleges that Coral Capital failed to full perform its obligations under the October 15, 2007 contract, that consideration was not fully paid for the shares issued to Nelson and Stephens, and that Nelson and Stephens have forfeited their right to the shares based upon conduct concerning use and disclosure of material non-public information regarding Plaintiff. (*See id*. at 3.)

Plaintiff asserts that Defendants used material non-public information regarding Plaintiff to sell approximately 75,000 shares of Plaintiff's stock. (Docket #17 at 2.) Plaintiff explains that Defendants were under the obligations of confidentiality agreements concerning the material non-public information. (*Id*.) Plaintiff commenced this action after Defendants sold the 75,000 shares, when Defendants requested the removal of restrictive legends from the shares. (*Id*.)

Plaintiff brings five claims: 1) no duty to register transferred shares pursuant to Colo. Rev. Stat. § 4-8-401, as to Defendants Nelson and Stephens; 2) declaratory judgment pursuant to Colo. Rev. Stat. § 13-51-101 (regarding no duty to register or remove the restrictive legend from the shares, that Defendants have no right to the shares and must return the shares to Plaintiff, and that Defendants are obligated to pay Plaintiff's costs and fees); 3) breach of contract claim against Defendants Coral Capital and Nelson; 4) breach of fiduciary duty by Defendants Coral Capital and Nelson; and 5) injunctive relief precluding Defendants from selling the shares at issue. (*See* docket #35.)

Defendants answered Plaintiff's complaint on February 22, 2011, and asserted eight counterclaims: 1) breach of contract; 2) violation of Colo. Rev. Stat. § 4-8-401 (regarding the

registration of the transfer of Defendants' shares fee of any restrictive legend); 3) conversion; 4) civil theft; 5) tortious interference; 6) common law fraud; 7) breach of fiduciary duty to shareholders; and 8) declaratory judgment that Plaintiff must remove the restrictive legend and register the transfer of the shares at issue. (*See* docket #11.)

On May 24, 2011, this Court held a Settlement Conference in this matter. (Docket #77.) Although the case did not settle at that time, negotiations proceeded among the parties, and they informed the Court that they came to an agreement on May 31, 2011. (Docket #84.) However, on June 30, 2011, the Plaintiff filed a "notice" informing the Court that "Defendants have withdrawn from a previously agreed-upon settlement." (Docket #89.) The following day, the Plaintiff filed the present Motion to Enforce Settlement Agreement. (Docket #91.) Plaintiff seeks an order enforcing an agreement allegedly reached on May 27, 2011, as set forth in an email sent from defense counsel, Gabriel McFarland, to Plaintiff's counsel, Steve Csajaghy:

1. Defendants will return the Sun River ("SR") shares they currently own.

2. SR will issue 40,000 free trading SR shares to Stephens, which may be freely traded upon execution of the settlement agreement, subject to paragraph 3.

3. Stephens will not sell or otherwise transfer more than 7,000 shares per week, or 2,000 shares in any particular day.

4. Plaintiff's claims against Stephens and Stephens' counterclaims will be dismissed with prejudice and the same will execute a mutual release.

5. Plaintiff's claims against Nelson and Nelson's counterclaims will be dismissed without prejudice.

6. We will more formally memorialize the settlement in writing, which will be executed as soon as possible but not later than June 3, 2011.

(May 27, 2011 Email, docket #91-5.) According to Plaintiff, the only term originally under

continuing negotiation was Paragraph 3, but asserts that it exchanged four (4) drafts of a written agreement with the Defendants articulating that term as: "Stephens would be limited to selling 500 shares per day for the first twenty (200) trading days during which the public securities markets are open following his receipt of shares, and that following that initial 20-day period, he would be limited to selling 1,000 shares of Sun River stock per day." (Motion at 3-4, docket #91.) Plaintiff contends that, by their silence, Defendants agreed to this term, and all material terms as set forth above. *Id.*

Defendants counter that, to date, Plaintiff still does not agree to its proposed Paragraph 3 and, thus, a meeting of the minds on the material terms has not occurred. (Response at 2, docket #99.) Defendants assert that their "counterclaims are in large part directed to obtaining full and unrestricted trading rights in their stock" and, thus, any silence on their part during the ongoing negotiations did "not constitute acquiescence by Defendants, who clearly took explicit issue with this critical contract term prior to execution of the agreement." (*Id*. at 4.) Defendants argue that Plaintiff cites no support for its notion that Defendants' silence during the exchange of drafts constitutes agreement, because such notion runs contrary to fundamental contract law. (*Id.*)

The Court held an evidentiary hearing on the motion on August 22, 2011, and granted the parties permission to file post-hearing briefs summing up the evidence and their positions. Plaintiff contends that, by Mr. McFarland and Defendant Nelson's testimony, it is clear that Defendants improperly backed out of a settlement due merely to "buyer's remorse." Defendants, by contrast, rely on Nelson's testimony that he did not understand or believe that a settlement had been reached due to the continuing exchange of draft agreements. Considering all evidence and the entire record herein, the Court is now prepared to rule on the motion.

## **DISCUSSION**

The Tenth Circuit has determined that a trial court has the power to enforce summarily a settlement agreement entered into by the litigants while the litigation is pending before it. *Shoels v. Klebold,* 375 F.3d 1054, 1060 (10th Cir. 2004).[1] In doing so, "issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law." *Id.* (citation omitted). A settlement agreement is a contract which will be construed using ordinary principles of contract interpretation. *Anthony v. United States*, 987 F.2d 670, 673 (10th Cir. 1993).

Under Colorado law, "a settlement agreement can be governed by and found enforceable under common law contract principles." *Yaekle v. Andrews*, 195 P.3d 1101, 1107 (Colo. 2008). A court may enforce a settlement agreement only if it constitutes an enforceable contract. *H.W. Houston Constr. Co. v. District Court*, 632 P.2d 563, 565 (Colo. 1981). Thus, a meeting of the minds as to the material terms and conditions of settlement is essential to the agreement's enforceability. *Pring v. Udall*, 31 P.2d 1113, 1116 (Colo. 1934). The essential elements of a contract must include "mutual assent to an exchange, between competent parties, with regard to a certain subject matter, for legal consideration." *Industrial Prods. Int'l v. Emo Trans, Inc.,* 962 P.2d 983, 988 (Colo. App. 1997) (citation omitted). An offer is a manifestation by one party of a willingness to enter into a bargain, and an acceptance is a manifestation of assent to the terms of the offer. *Id.* (citing Restatement (Second) of Contracts §§ 24, 32 (1979)).

Several years ago the magistrate judges of this Court uniformly began reducing to writing

---

[1] Judge Krieger has found that a federal court lacks jurisdiction over the enforcement of a settlement agreement for which the parties do not dispute the formation of a contract. *See Rocky Mountain Mortgage Specialists, Inc. v. First American Real Estate Info. Servs., Inc.*, Civil Action No. 07-cv-00815-MSK-MEH, 2008 WL 4293316, *2 (D. Colo. Sept. 16, 2008). In this case, however, Defendants dispute the formation of the settlement agreement.

settlement agreements reached during judicial settlement conferences (many of which were traditionally entered orally on the record at the successful conclusion of the conference), in response to the requirements set forth in *National Union Fire Ins. Co. of Pittsburgh v. Price*, 78 P.3d 1138 (Colo. App. 2003). In that case, the Colorado Court of Appeals, applying Colo. Rev. Stat. § 13-22-308(1), found that an agreement reached during mediation can be an enforceable court order only if, quoting from the statute, it is "reduced to writing and approved by the parties and their attorneys, if any."[2] In an abundance of caution, the undersigned and other magistrate judges began utilizing written settlement agreements at the conferences.

Recently, however, the Colorado Supreme Court commented on the *Price* decision, finding that Section 308 did *not* abrogate the common law of contracts in the context of mediation proceedings and, contrary to the *Price* holding, "did not mandate a single method that must be followed for the formation of a binding agreement [in] mediation . . . ." *Yaekle*, 195 P.3d at 1108.[3] In *Yaekle*, the parties had signed a "basic terms of settlement" document provided by the mediator. Before a more comprehensive agreement was signed, the parties began renegotiating terms, ultimately reducing their negotiations to a proposed agreement. At the end of that renegotiation, the plaintiff refused to sign. Utilizing common law contractual principles, the court found not only that the "basic terms of settlement" were binding (a proposition with which neither party disagreed), but also that the renegotiated terms constituted a binding contract. Although the plaintiff had not signed

---

[2]The statute has not been applied in federal matters involving settlement agreements; however, the decisions addressing the statute discuss and apply Colorado common law of contracts in the mediation context and are helpful for that purpose.

[3] The court noted that the "traditional tenets of common law contracts and settlement, which are sensitive to the requirements of justice, stand in stark contrast to those formulaic requirements imposed by an exclusive reading of section 308." *Id.* at 1107.

any document containing the new terms, he had orally authorized his attorney to agree to them, which the Supreme Court found sufficient. *Id.* at 1111 ("Yaekle accepted the offer, as clearly shown through his counsel's representations to the court.").[4]

Here, unlike in *Yaekle*, there was no written agreement signed by any of the parties at any time. Defendants' representation to the Court that the parties had come to an agreement was made before the terms of the agreement were expressed in any writing – here, a May 27, 2011 email from defense counsel to Plaintiff's counsel setting forth the understood terms. (*See* dockets #91-4 and #91-5.)[5] But, even the May 27, 2011 written terms included mutual "caveats," or conditions that each counsel needed to confer with his clients regarding the "number of shares traded per week/per day, etc." by Defendant Stephens. (Docket #91-5.) Certainly, such "caveats" reflect no meeting of the minds on at least one of the material terms on May 27, 2011.

Plaintiff argues that Defendants eventually agreed to a number of shares to be sold/traded by Stephens (which was proposed in their first draft agreement on June 1, 2011) when Defendants failed to change or dispute the number in subsequent exchanges of the proposal. In fact, subsequent emails between counsel reflect that the parties were still exchanging drafts of the settlement agreement to the point when the Defendants proposed new settlement terms and the Plaintiff notified the Court of Defendants' alleged "withdrawal" from settlement on June 30, 2011. *See* June 30, 2011 email from Steve Csajaghy to Gabe McFarland, docket #91-1, and June 29, 2011 email from

---

[4]The court also recognized that, in some instances, "the final and fully executed [settlement] agreement may be the only admissible evidence of a contract, and thus a court's determination as to whether or not a contract has been established at common law is determined from the one document alone." *Id.* at 1110.

[5]The exhibits presented at the August 22, 2011 hearing have not been filed on the Court's docket; therefore, the Court will refer to the exhibits as they appear on the docket attached to the briefing in this matter.

McFarland to Csajaghy, docket #91-11.  In fact, on June 16, 2011, McFarland sent to Csajaghy a "revised" version of the June 1, 2011 draft agreement in which McFarland added language in certain portions of the draft, including Paragraph 2 concerning "Consideration" and in other paragraphs. *See* docket #91-6.  McFarland did not change the proposed number of shares Stephens would be allowed to sell, as proposed in Paragraph 4 concerning "Stephens' Agreement Regarding Future Sale of Shares in Sun River," but added language to Paragraph 4 which apparently would have preserved certain of Stephens' rights in the event Plaintiff announced a breach by Stephens in the number of shares sold.  *See id.*  Thereafter, in McFarland's June 29, 2011 email, he not only continues to negotiate the "Consideration" and other portions of the agreement, but also disputes certain portions of Paragraph 4 that were apparently deleted by Plaintiff in the previous draft.  *See* docket #91-11. Of note is the following deleted language in Paragraph 4 concerning Stephens' ability to demonstrate no breach of Paragraph 4 of the agreement:

> In the event that Stephens demonstrates that he has not committed any such breach, he shall be entitled to immediately sell all or any portion of the new Stephens shares.

Docket #91-11 at 8.  With respect to this and other deleted language, McFarland informed Csajaghy that "either the provisions I marked on the attached must remain in the agreement or we do not have a deal."  *Id.* at 1.

Thus, despite Plaintiff's argument to the contrary, there was no meeting of the minds regarding the material settlement term set forth in Paragraph 4.  Although Plaintiff now couches the settlement term as a simple "number of shares sold per day/per week," the Court construes the term as set forth in the entire paragraph, including the "breach" and damages portion of the agreed term. Contrary to Plaintiff's anticipated argument that such "breach" language is simply corollary to the actual number of shares sold per day/week, the Court finds that the language deleted by Plaintiff

concerning Stephens' ability to demonstrate no breach relates directly to the shares to be sold and is just as material to the entirety of Paragraph 4 as is the actual number of shares to be sold. It is clear by McFarland's email and notes on the draft agreement that Stephens would not agree to Paragraph 4 without Plaintiff's agreement to retain the language deleted by Plaintiff. Accordingly, there was never a meeting of the minds on the material term concerning Stephens' future sales of shares in Sun River.

Moreover, despite Plaintiff's protestations, one of the "material terms" set forth in the May 27, 2011 email was that the parties "will more formally memorialize the settlement agreement in writing, which will be executed as soon as possible but not later than June 3, 2011." Docket #91-5. While Defendants argue that no such writing materialized on or before June 3, 2011 and, thus, no agreement exists, the Court is not concerned so much with the deadline, but with the fact that both parties agreed to a "formal writing." In fact, the parties' actions in exchanging drafts of the agreement demonstrates their intent in this regard. However, the agreement was never reduced fully to a writing, since drafts were still being exchanged when negotiations broke down on June 30, 2011. Further, there is no indication in any email or other communication that the parties "came to a deal" on the written drafts.

Plaintiff cites Colorado caselaw concerning oral agreements that need not be reduced to writing, but cites no law demonstrating that silence on a specific term during negotiations of the entire agreement constitutes agreement or acquiescence of that term. The Court agrees with Defendants that such notion contradicts common sense and basic contract law. Instead, silence with respect to an agreement seems to constitute acquiescence only in limited and specific circumstances. *See, e.g., Jones v. Dressel*, 582 P.2d 1057, 1059 (Colo. App. 1978) (a contract with a minor who

assents at majority or who is silent for a "considerable length of time" may be valid); *see also Convers v. Lee*, 511 P.2d 506, 507 (Colo. App. 1973) (no agreement reached for total amount due based merely on silence of payee of the challenged invoice).

The Tenth Circuit has cited the Restatement in adjudicating a matter under New Mexico law for the proposition that "silence operates as an acceptance 'where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.'" *Shively v. Santa Fe Preparatory Sch., Inc.*, 21 F. App'x 875, 877 (10th Cir. 2001) (finding that, based on conduct during the previous seven years, the school district had a duty to tell plaintiff that it did not accept her counteroffer limiting its right not to reemploy her at the point at which the district took the benefits of her teaching services under that contract) (citing Restatement (Second) of Contracts § 69(1)(c) (1981)). However, there is no indication that Colorado has adopted this restatement nor the proposition underlying it.

## CONCLUSION

After considering the evidence offered, the Court concludes there was no meeting of the minds on a material term of the settlement agreement in this matter. Accordingly, for the reasons stated above, the Court hereby ORDERS that Plaintiff's Motion to Enforce Settlement Agreement and for Sanctions [filed July 1, 2011; docket #91] is **denied**. The litigation of this matter will proceed as scheduled.

Dated at Denver, Colorado, this 7th day of September, 2011.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge