**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 11-cv-00198-MSK-MEH

SUN RIVER ENERGY, INC.,

       **Plaintiff,**

v.

ERIK S. NELSON;
STEVE STEPHENS; and
CORAL CAPITAL PARTNERS, INC.,

       **Defendants.**

_____

**OPINION AND ORDER OVERRULING OBJECTIONS AND**
**AFFIRMING DENIAL OF MOTION TO ENFORCE SETTLEMENT**
_____

**THIS MATTER** comes before the Court pursuant to the Plaintiff's Motion to Dismiss

Counterclaims (**# 25**)[1]; and the Plaintiff's Objections (**# 160**) to the Magistrate Judge's

September 7, 2001 Order (**# 152**) denying the Plaintiff's Motion to Enforce Settlement

Agreement (**# 91**).

According to the Magistrate Judge's Order, this action concerns a dispute over the

Defendants' acquisition of shares of the Plaintiff's stock and the rights flowing therefrom.  In

late May 2011, the parties entered into settlement negotiations, and on May 31, 2011, advised

the Magistrate Judge that they had settled (**# 84**) the case.  Less than two months later, the

---

[1]The Defendants have subsequently amended their counterclaims (**# 71**) in substantive ways, and the Plaintiff has filed an answer (**# 186**) to those amended counterclaims.  Thus, the Plaintiff's motion directed against the original counterclaims is denied as moot.

Plaintiff file a Notice (**# 89**) stating that the Defendants had withdrawn from the agreement settling the case, and the next day, the Plaintiff filed a Motion to Enforce Settlement Agreement (**# 91**).  On August 22, 2011, the Magistrate Judge conducted an evidentiary hearing with regard to that motion, and on September 7, 2011, issued the instant Order (**# 152**) denying the Plaintiff's motion.

Specifically, the Magistrate Judge found that the parties reached agreement on a general outline of terms for a settlement on May 27, 2011, and proceeded to negotiate specific terms within that outline.  The parties exchanged several versions of draft agreements, but, according to the Plaintiff, none of those versions differed with regard to a provision addressing the ability of Defendants Stephens to sell his shares in the Plaintiff over a particular period of time (the "paragraph 3 provision").  The Plaintiff understood the Defendants' failure to propose changes to that provision to constitute acquiescence to that term; the Defendants acknowledge that they did not seek to modify the number of shares that could be sold, but were continuing to negotiate other aspects of that issue, including the ability of the Plaintiff to declare a breach of that sales restriction and the right that Defendant Stephens would retain in such circumstances (the "paragraph 4 provisions").  The Magistrate Judge rejected the Plaintiff's contention that the "number of shares to be sold" term was severable from the other issues still in negotiations, such that "there was never a meeting of the minds on the material term concerning Stephens' future sales of shares."  (The Magistrate Judge also rejected the argument that the Defendants' acquiescence to the "number of shares to be sold" term could be inferred from the Defendants' silence on that term during negotiations, finding that the sole cited support for that contention was a New Mexico case citing the Restatement of Contracts, and that "there is no indication that

Colorado has adopted this restatement nor the proposition underlying it.")

The Plaintiff filed timely Objections (**# 160**) to the Magistrate Judge's Order, arguing: (i) the Magistrate Judge erred in finding that the lack of a meeting of the minds on the paragraph 4 provisions prevented an enforceable agreement because those terms were "non-essential and non-material," and that only the paragraph 3 provisions were material to the parties' agreement[2]; (ii) the Magistrate Judge failed to note that the Plaintiff was never given an opportunity to accept the Defendants paragraph 4 provisions before the Defendants ended further negotiations; (iii) the Magistrate Judge erred in finding that the reduction of the negotiations to a formal written and signed agreement was a term of the agreement between the parties; and (iv) several arguments relating to certain matters on which the Magistrate Judge made no particular findings.

The Plaintiff contends that the Magistrate Judge's Order was a dispositive one, such that this Court reviews it *de novo* pursuant to Fed. R. Civ. P. 72(b). The Court does not necessarily agree, but exercising a *de novo* review, finds that the Magistrate Judge's decision was correct.

The parties do not dispute that this issue presents a question of whether a contract was formed under Colorado law. The parties also do not dispute the basic principle that a contract is formed when there is "a meeting of the minds as to the material terms and conditions" of the agreement. *Pring v. Udall*, 31 P.3d 1113, 1116 (Colo. 1934). Two issues are presented here: (i) was there an meeting of the minds with regard to the paragraph 3 provisions, which the parties

---

[2]The Plaintiff contends further that the Defendants never raised this argument. Having reviewed the Defendants' response (**# 99**) to the Plaintiff's Motion to Enforce, this Court finds that the relevant issues are sufficiently ascertainable that the Plaintiff cannot claim undue surprise. Moreover, as the party seeking to enforce a contract, it is the Plaintiff's independent burden to prove all of the relevant elements of contract formation, including that the parties reached a meeting of the minds on all material terms, regardless of what the Defendants may have argued.

appear to agree was a material term; and (ii) were those issues on which the parties failed to

reach agreement – the paragraph 4 provisions – material terms as well.

The Court finds the second issue a more fruitful area of discussion.  Whether a particular

contractual term is material (or, as is more commonly used in Colorado caselaw, "essential") is a

question that is determined by examining the intention of the parties as disclosed by the

surrounding facts.  *Ball v. McCann*, 535 P.2d 233, 235 (Colo.App. 1975).

Here, the record indicates that the first indicia of an agreement between the parties came

in a e-mail exchange between Mr. Csajaghy (on behalf of the Plaintiff) and Mr. McFarland (on

behalf of the Defendants) that began on May 26, 2011.  We join the action already in progress,

with Mr. Csajaghy stating to Mr. McFarland:

> Your clients' offer is rejected.  Sun River's settlement offer of
> 40,000 shares to Stephens and none for Nelson with the other
> contingencies we discussed will expire at noon on Tuesday, May
> 31st and it will not be renewed thereafter. . . .

The e-mail in the record reveals that Mr. McFarland responded on May 27, 2011 by stating,

simply, "we have a deal.  Pls. call me."  (The Plaintiff makes much of Mr. McFarland's

statement that "we have a deal," but it is clear from the ensuing discussions that such a statement

reflects only the Defendants' agreement to the general outline of the deal, not a concession that

Mr. Csajaghy's e-mail itself recites any final terms.)  A few minutes later, Mr. McFarland sent

Mr. Csajaghy a message stating:

> here are the settlement terms as I understand them:
>
> . . .
>
> 3.  Stephens will not sell or otherwise transfer more than
> 7,000 shares per week, or 2,000 shares in any particular

day.[3]

4. Plaintiff's claims against Stephens and Stephens' counterclaims will be dismissed with prejudice and the same will execute a mutual release.

. . .

6. We will more formally memorialize the settlement in writing, which will be executed as soon as possible . . .

Please let me know immediately if my understanding is inaccurate in any respect.

Mr. Csajaghy responded that "Agreed, with the caveat that I need my client's approval on the number of shares traded per week/per day, etc. I will suggest to them that this number you and I have discussed is fair . . . ." Mr. McFarland responded, "I have the same caveat."

On June 1, 2011, Mr. Csajaghy e-mailed Mr. McFarland, stating "Per our conversation last week, attached is a proposed settlement agreement. As I said in my voice message to you this morning, Sun River has agreed to the sale of 1,000 shares per trading day, which shall not be cumulative." Attached to this e-mail was a 5-page draft settlement agreement (the "first draft agreement") that, among other things, provided that Defendant Stephens, "for the first twenty (20) trading days . . ., shall not sell in excess of 500 shares of Sun River stock per day [and thereafter] shall not sell in excess of 1,000 shares of Run River stock per day." The agreement further provided that "[a]ny violation of this Agreement by Stephens" will result in a variety of penalties, including forfeiture of Mr. Stephen's remaining stock, injunctive relief, and payment

---

[3]Although these numbers were subsequently modified, the first appearance of the sales limitations in this enumerated paragraph gives rise to the reference to the sales limitations as the "paragraph 3 provisions."

of costs and fees to the Plaintiff.[4]

Two weeks later, Mr. McFarland returned a draft of the agreement with certain changes (the "second draft agreement"). Mr. McFarland did not make any material alterations to the 500/1,000 share sales limitations, but he omitted the statement that, upon a breach, Mr. Stephens would forfeit his ownership of the remaining stock; in addition, he included a statement to the effect that, if the Plaintiff unsuccessfully asserted a breach of the sales limitation, Mr. Stephens "shall be entitled to immediately sell all or any portion of" his remaining stock.

A week after that, Mr. Csajaghy responded with yet another draft of the agreement (the "third draft agreement"). In the message attached to that draft, Mr. Csajaghy states "there are really no substantive changes to what was proposed, so we should be there." Notwithstanding that optimism, this draft inserted a new provision stating that, upon a breach of the sales limitations by Mr. Stephens, the Plaintiff would be entitled to an injunction "ordering Stephens to immediately return all such stock to Sun River, including shares sole prior to any such violation of this Agreement," and struck out the provision lifting any sales restrictions on Mr. Stephens in the event of an unsuccessful claim of breach by the Plaintiff.

Mr. McFarland responded with a copy of the third draft agreement containing certain handwritten annotations indicating that Mr. McFarland did not consent to the removal of the passage that would lift all restrictions on Mr. Stephens if the Plaintiff made an unfounded

---

[4]Both the sales limitations and the penalties for breach were contained in paragraph 4 of the draft settlement agreement, hence the designation "paragraph 4 provisions." (The "paragraph 3 provisions" Notably, the paragraph containing this discussion of breach and penalty (but not the paragraph containing the limits on the number of shares to be sold) states "Stephens hereby agrees and covenants that, the sales limitations described in this paragraph are material to the making of this Agreement."

accusation of breach.  In the accompanying message, Mr. McFarland explained that this term

"simply gives [the Plaintiff] an incentive only to make legitimate claims."  He goes on to state

"the way [the Plaintiff] has structured this agreement, Defendants have no or virtually no room

to further negotiate these terms.  In other words, either the provisions I marked on the attached

[including the provision lifting the sales limits] must remain in the agreement or we do not have

a deal."

It appears that, shortly thereafter, Mr. McFarland spoke to Mr. Csajaghy and informed

him that the Defendants "now reject all previous settlement agreements."

It is clear from the foregoing that the parties never reached a meeting of the minds with

regard to the paragraph 4 provisions.  The Plaintiff attempts to minimize the significance of that

fact by arguing that no such meeting of the minds was necessary because the paragraph 4

provisions were not essential terms of the agreement.  But the Plaintiff's own conduct belies that

assertion.  Notably, it was the Plaintiff that first drafted those provisions and included them in

the first draft agreement.  This alone suggests that the Plaintiff considered the paragraph 4

provisions to be significant enough to warrant mention.  Moreover, when the Defendants struck

the provision deeming Mr. Stephens to forfeit his stock upon a breach of the sales limitations as

part of the second draft agreement, the Plaintiff did not simply accept that modification; instead,

it reinserted that forfeiture provision (in slightly different language) as part of the third draft

agreement.  This is fatal to the Plaintiff's contention that the paragraph 4 provisions were

immaterial to the whole of the parties' agreement.  If the forfeiture provision was, as the Plaintiff

argues, immaterial, the Plaintiff should have had no objection to the Defendants striking it from

the agreement.  By insisting that it be re-inserted as part of the third draft agreement, the Plaintiff

reveals its belief that the provision <u>was</u> an important component of the Plaintiff's proposed

agreement. Further, if the forfeiture provision was considered by the Plaintiff to be material,

there is little reason to believe that the parties did not similarly consider the remaining disputed

components of the paragraph 4 provisions to be similarly material. Indeed, the back and forth

between the parties over those very provisions strongly suggests that both parties considered

those provisions to be important components of their overall agreement.

Thus, the Court finds that, contrary to the Plaintiff's arguments, the paragraph 4

provisions constituted material terms of the parties' agreement for which there was never any

meeting of the minds. As a result, there was never any enforceable agreement between the

parties and thus, no settlement of the case.[5]

Thus, the Court **OVERRULES** the Plaintiff's Objections **(# 160)** and **AFFIRMS** the

Magistrate Judge's Order **(# 152)**. There being no settlement of this case, the parties are directed

---

[5]Based on these findings, the Court need not reach the other argument offered by the Plaintiff – that the Defendants' silence with regard to the actual sales limits in the second and subsequent draft agreements constitutes the Defendants' acquiescence to those limits. Nevertheless, the Court has some doubt as to the merits of such a contention. The draft agreements closely couple the paragraph 4 penalties to the paragraph 3 sales limitations, as the former is a punishment for a breach of the latter. In this sense, then, the Court would consider them to be a unitary subject of negotiation, such that the Defendants might be said to have been willing to accept the lower limits proposed by the Plaintiff <u>only</u> in exchange for softened penalties should such limits be breached, and the absence of agreement on the latter negates any apparent agreement as to the former.

To illustrate this point, imagine a salary negotiation in which the employer offers the employee a 2% raise and 1 extra vacation day, and the employee responds with "2 vacation days." The Plaintiff here would argue that, through his silence regarding the raise, the employee has accepted the offer of a 2% raise regardless of how many vacation days the parties ultimately agree on. A more reasonable interpretation of the employee's counteroffer is "I would accept a 2% raise if I also get 2 vacation days, but I would not accept that raise if only 1 vacation day is being offered." The failure of the parties to ultimately reach agreement on vacation days thus would not permit a conclusion that the employee had nevertheless accepted the offer of (only) a 2% raise.

to proceed with this case according to the Scheduling Order issued by the Magistrate Judge.  The

Plaintiff's Motion to Dismiss Counterclaims **(# 25)** is **DENIED AS MOOT.**

     Dated this 2nd day of March, 2012

                 **BY THE COURT:**

                 Marcia S. Krieger
                 United States District Judge